KATHERINE VENTI, USB #9318
MICHAEL W. YOUNG, USB #12282
ALAN S. MOURITSEN, USB #13558
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone:  801.532.1234
Facsimile:  801.536.6111
KVenti@parsonsbehle.com
MYoung@parsonsbehle.com
AMouritsen@parsonsbehle.com
ecf@parsonsbehle.com

*Attorneys for Plaintiffs*

---

## IN THE FOURTH JUDICIAL DISTRICT COURT

## FOR THE COUNTY OF UTAH, STATE OF UTAH

| | |
|---|---|
| CORY COLLETT, BRIEANNE VAN DE GRAAFF, PAULA CRAIG, KJIRSTEN ADAMS, and ROBYN NEWELL<br><br>          Plaintiffs,<br><br>vs.<br><br>CITY OF PROVO, UTAH, and JOHN KING, an individual,<br><br>          Defendants. | **COMPLAINT AND JURY DEMAND**<br><br>Case No. _____<br><br>Judge _____<br><br>TIER 3 |

## SUMMARY OF CASE

In the fall of 2014, Mayor John Curtis called a supervisor-only meeting at the Provo City Police Department (the "Department"). There had been numerous complaints regarding the new Chief of Police, John King; including a complaint and allegation that Chief King had sexually harassed a female dispatcher. With Chief King by his side, Mayor Curtis told the supervisors that he did not want to receive any more complaints about Chief King. Chief King was going to remain Chief of the Department as long as Curtis was in office and there was nothing the supervisors could do about it. Mayor Curtis's message was loud and clear: Chief King's power was unlimited, his actions unchecked, and any complaints against him would be ignored.

Provo City placed Chief King in a unique position of authority and power. Chief King exploited and misused the power and authority Provo City granted him time and time again for a period of three years. Chief King's pervasive pattern of assault and harassment ultimately culminated in the rape of Brieanne Van De Graaff.

Accordingly, Plaintiffs Cory Collett, Paula Craig, Kjirsten Adams, Robyn Newell and Brieanne Van De Graaff (together, "Plaintiffs"), by and through counsel, complain of Defendants, City of Provo, Utah, and John King, and allege as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Cory Collett at all relevant times was an employee of the Provo City Police Department and is a resident of the State of Utah.

2.      Plaintiff Paula Craig is and at all relevant times was an employee of the Provo City Police Department and is a resident of the State of Utah.

4825-5392-6495v1

3.      Plaintiff Kjirsten Adams is and at all relevant times was an employee of the Provo City Police Department and is a resident of the State of Utah.

4.      Plaintiff Robyn Newell is and at all relevant times was an employee of the Provo City Police Department and is a resident of the State of Utah.

5.      Plaintiff Brieanne Van De Graaff was at all relevant times a volunteer working with the Provo City Police Department, and is a resident of the State of Utah.

6.      Defendant City of Provo, Utah ("Provo" or "Provo City") is a municipal government located in the State of Utah.

7.      Defendant John King ("King" or "Chief King") was at all relevant times an individual residing in Utah.

8.      During the relevant time period, King was employed by Provo as Chief of Police.

9.      Jurisdiction and venue are appropriate in this court under Utah Code §§ 78B-3-1 *et seq.*

## FACTUAL ALLEGATIONS

10.     In November 2013, Provo hired King as Chief of the Department. Then-Mayor John Curtis stated in a blog post announcing King's hiring that "For the past two years, [King] has been the Director of a Police Academy in Hagerstown, Maryland and before that served as the Chief of Police in Gaithersburg[, Maryland]."

11.     The post did not state why King left his previous positions.

12.     News reports regarding King's prior employment, however, show that King had been forced to resign from his position in Gaithersburg, and had also been forced to resign from a subsequent position in Baltimore, something Curtis did not mention in his blog post.

3

13.   On January 22, 2010, the Town Courier, a local newspaper in Gaithersburg, reported that King had "abruptly quit" his job as police chief in that town "four days after the city's elected officials held an executive session to discuss a 'personnel matter'" involving King.

14.   Gaithersburg officials did not disclose the nature of the "personnel matter," but Gaithersburg City Manager Angel Jones said in a statement that King was "resigning to pursue opportunities in the private sector."

15.   Despite this representation, King did not spend much, if any, time in the private sector. On December 16, 2011, the Baltimore Sun reported that King had been hired to lead the Baltimore Police Department's education and training division.

16.   The same article noted that King had previously been investigated by federal prosecutors for abuse of Montgomery County's disability retirement system, although charges were never filed.

17.   King spent just six months with the Baltimore Police Department. On June 27, 2012, the Baltimore Sun reported that King had "abruptly resigned," again due to a "personnel issue." The Sun also reported that the "personnel issue" involved a complaint from an employee.

18.   At the time, King denied that a complaint had been filed against him. However, public records show that King was forced to resign due to an employee's allegation that King groped her in a patrol car.

19.   In November of 2012, as reported, King's attorney sent a demand letter to the City of Baltimore, seeking $2 million in damages for supposed "constitutional violations" related to his termination, but acknowledging that the reason the city gave for terminating King was his "misconduct with a subordinate."

20.     Separately, the attorney for King's accuser sent a letter to the City of Baltimore, notifying the city of her intent to sue the city and the police department over King's misconduct.

21.     Meanwhile, King was hired as director of the Hagerstown Community College Police Academy ahead of the Academy's inaugural class, which began in March of 2013.

22.     On October 15, 2013, as reported, King, his accuser, the City of Baltimore, and the Baltimore Police Department reached a settlement for both King's and his accuser's claims. The city and the police department agreed to pay King's accuser a monetary settlement, while King was released from liability for the assault.

23.     Thirty-six days later, Mayor Curtis announced King as Provo City's Chief of Police. Curtis stated that the decision to hire King came after "months of reviewing applications, interviewing candidates, and listening to the counsel of our seven-member citizen committee."

24.     Upon information and belief, shortly after Provo hired Chief King, more than one employee of the Department found the news reports about King through internet searches and brought those to the attention of Provo.

25.     A short time into his tenure as Chief of Police, King began engaging in inappropriate conduct with employees, some of which was reported to the Department and/or the Mayor.

26.     Chief King spent a lot more time in the dispatch center compared to his predecessors. He would stand uncomfortably close behind dispatchers, who were all female, touch their shoulders, look down their shirts, and stare at their breasts.

27.     Cory Collett was employed by the Provo City Police Department as a police dispatcher at the time that Provo hired King, and was subjected to Chief King's inappropriate conduct beginning in April 2014.

28.     In April 2014, as Cory Collett, Chief King, and others walked to an awards presentation for dispatchers, Chief King told Ms. Collett, who was 28 at the time, that he had had a dream about her.

29.     Shortly thereafter, Cory Collett was working at the dispatch center with five other dispatchers. Chief King was seated on the desk of the dispatch supervisor. Chief King made a comment about her breasts, referring to them as "puppies." After Chief King left the room, Ms. Collett noted how awkward, weird, and uncomfortable Chief King's comment and behavior had made her feel. Her fellow dispatchers agreed.

30.     At a "Torch Run" event raising funds for the Special Olympics and individuals with intellectual disabilities, Chief King openly leered at Ms. Collett's breasts while she was dressed in a running outfit.  King was approximately 56 at the time.

31.     The pattern of harassment and humiliation continued. About two weeks following the event, Chief King brought his son into the dispatch center. Chief King stood immediately behind Ms. Collett (up against her chair) and told her to show him and his son pictures of herself in workout attire from the Torch Run. As Chief King waited for Ms. Collett to do as he had asked, he placed his hand on her shoulder and tried to look down her shirt.

32.     The pattern of harassment ultimately caused Ms. Collett to quit her job. During her exit interview in July 2014, Ms. Collett made a formal complaint regarding Chief King's behavior.

33.     Ms. Collett's exit interview was conducted by Lieutenant Siufanua.

34.     During her exit interview, Ms. Collett described the incidents involving Chief King and expressed a desire to file a formal complaint against him.

35.     Lieutenant Siufanua, who was a subordinate of Chief King, was reluctant to move forward with the complaint. In fact, Lieutenant Siufanua told Ms. Collett that she couldn't file a complaint based only on an "icky feeling." Ms. Collett insisted that it was not just a feeling, and that Chief King had done things to her that crossed the line into sexual harassment.

36.     Ms. Collett was concerned that her complaint was not being taken seriously and followed up at least twice with Chris Cooper at the human resources department between July and September of 2014.

37.     During their second conversation, Ms. Cooper informed Ms. Collett that Mayor Curtis had given Chief King a "heads up" regarding her complaint.

38.     After Chief King received the "heads up" from the Mayor, Ms. Collett and her fiancé were at a recreation center in Provo watching a basketball game.

39.     At the game, Chief King walked up to Ms. Collett and her fiancé directly and attempted to engage them in a long conversation.  Ms. Collett quickly left but Chief King insisted that her fiancé engage in further conversation.

40.     The tone and tenor of the exchange sent a clear message to Ms. Collett and her fiancé—who currently is and was at the time a police officer in the Department—that Chief King was unmoved by the complaint and that he held Ms. Collett's fiancé's career in his hands.

41.     Apart from receiving confirmation that King had been informed of the complaint against him, no Provo personnel reached out to Ms. Collett regarding her complaint.

42.     Upon information and belief, no disciplinary action was taken against Chief King as a result of Ms. Collett's complaint.

43.     Indeed, Chief King soon thereafter told a female subordinate—Kjirsten Adams— that it had been brought to his attention that he leers at the breasts of female subordinates, and then rhetorically asked Ms. Adams whether she agreed with that statement.

44.     In short, Chief King was unmoved by the "heads up" he received from Mayor Curtis, Ms. Collett's complaint was not kept confidential, and the Mayor's and the Chief's reactions to it only served to chill the reporting of any other misconduct.

45.     Other female Provo City Police Department employees had similar experiences to Ms. Collett. They noted that Chief King came to the dispatch center with unusual frequency, that he tended to leer at and hover over female employees, that he touched them inappropriately, and that he regularly invaded their personal space in a manner that made them feel uncomfortable.

46.     Paula Craig describes similar incidents involving Chief King. Ms. Craig has worked under six different chiefs over the course of 27 years at the Department.

47.     During one of her first meetings with Chief King to discuss the department budgeting process, she recounts that he was staring at her breasts during the entire 30 minutes of the meeting, which was held at a small round table in Chief King's office.

48.     Lieutenant Siufanua and Captain Jerry Harper were also present.  Chief King had no regard for the presence of the other two officers as he blatantly leered at Ms. Craig.

49.     In March of 2015, Chief King asked Ms. Craig to assist him with an issue he was having with his email at the copy machine outside of Ms. Craig's office. Ms. Craig obliged and helped Chief King with the technical issue.

8

50.     After she assisted Chief King, he reached his arm around her and firmly groped her right breast and pulled her closer to him three times as he said, "good job."

51.     Beginning in January 2016, Ms. Craig underwent two separate, major surgeries on her neck and back. She was required to take leave on two separate occasions to recover and recuperate.

52.     Ms. Craig's doctor instructed her (and Provo City Human Resources Department) that she should not work for several weeks in order to heal.

53.     Chief King contacted Ms. Craig while she was on approved FMLA leave, asking her when she was going to return to work because, as he told her, "he missed the scenery."

54.     This harassment persisted for several months with Chief King even directing Ms. Craig's supervisors to pressure Ms. Craig into returning to work. Accordingly, Ms. Craig was forced to return to work early from her leave.

55.     Upon Chief King's resignation, Ms. Craig contacted her superiors and informed them of the awkward dynamic, and later after King's resignation she informed them of King's inappropriate comment.

56.     On a separate occasion, Ms. Craig and a friend were passing through the Department on the way to lunch when Chief King passed the two women in the hallway. Chief King approached the women and introduced himself.  During the conversation it was revealed that Ms. Craig and her friend were considering a trip to Las Vegas.

57.     Later that week, Chief King went into Ms. Craig's office and said that he intended to go to Las Vegas with Ms. Craig and her friend and offered to pay for the room.

4825-5392-6495v1

58.     Chief King then stated that nothing they talked about in Ms. Craig's office was to leave the room and that the trip to Las Vegas "was going to happen." At the time, Ms. Craig simply indicated that the trip wasn't planned and that she didn't really know if it was ever going to take place.

59.     Chief King continued to press Ms. Craig to plan the trip to Las Vegas, often showing up in her office unannounced and closing the door.  These visits would often occur late in the evening with Chief King wearing workout attire.

60.     Chief King's look and demeanor was aggressive and left Ms. Craig feeling intimidated and without recourse. His advances reached a point where Ms. Craig would hide in her office or the bathroom if she heard Chief King coming toward her office.

61.     Ms. Craig ultimately disclosed Chief King's actions to Camille Williams and Chris Cooper upon Chief King's resignation and informed both of them that there likely several others.

62.     Ms. Craig further indicated that because of Chief King's position of power, no one felt comfortable coming forward about his actions.

63.     Upon information and belief, nothing was ever done in response to this report.

64.     Chief King also sexually harassed and assaulted Kjirsten Adams, an 18-year employee and 15-year supervisor at the Provo City Police Department. Ms. Adams started working at the Department in 1996 and was promoted to supervisor in 2003. Ms. Adams has a sterling record of professionalism and integrity at the Department.

65.     When Chief King was hired, Ms. Adams, a single mother of four children, was working the graveyard shift at the dispatch center. When Chief King would visit the dispatch

center, he would sit at Ms. Adams's workstation, stare at her breasts, comment on how attractive she looked, and touch her without her consent.

66.     Chief King would also demand that Ms. Adams meet him in an adjoining parking lot after her shift. As a dispatch supervisor and someone who was required to report directly to Chief King, Ms. Adams had little choice but to comply.

67.     During these middle-of-the-night meetings (which took place while Ms. Adams was in her car and Chief King was in his), Chief King would make sexually suggestive comments to Ms. Adams, asking her (for example) when her kids were scheduled to be out of the house so he could come over.

68.     Chief King would arrange these meetings with Ms. Adams via text under the guise of official police business. He would also send inappropriate personal text messages to Ms. Adams, and he often ordered Ms. Adams to attend private "meetings" during work hours under the pretext of Department business.

69.     On another occasion, Chief King called Ms. Adams just as she was waking up from a nap after her graveyard shift. When Ms. Adams told the Chief that she was just waking up, Chief King said he "would be right over."

70.     In addition to his meetings with Ms. Adams in the parking lot, Chief King continually pressured Ms. Adams to have lunch with him. Unable to put him off and with no one else to turn to, Ms. Adams finally relented.

71.     Driving separate cars, Chief King (who was in full uniform) and Ms. Adams met at Café 300, which happened to be closed. Chief King then asked Ms. Adams to join him in his car

to go to another restaurant. Again seeing little choice but to join the Chief of Police in his vehicle, Ms. Adams did so.

72.     As soon as she got in the car, Chief King started rubbing her leg and asked her if she wanted to "go for a drive."

73.     Ms. Adams refused, insisting that they just try a different restaurant. Ms. Adams says that she was frightened and intimidated, and that she had no idea what Chief King might do to her.

74.     Not long after this incident, Chief King met with Ms. Adams at a small table in his office. As Chief King rubbed Ms. Adams's back and stared at her breasts, he said that some female employees had complained of his leering at their breasts, and then asked whether Ms. Adams agreed with those complaints.

75.     To Ms. Adams, Chief King's message to her was unmistakable: Provo was doing nothing with regard to complaints against Chief King, no complaint would be kept confidential, and any complaint would lead to Chief King retaliating against the complainant.

76.     Declining to voice any concerns through official channels given Provo City's inaction and Chief King's complete and utter control of the process, Ms. Adams confided in another employee that she was uncomfortable with her interactions with Chief King, but did not wish to put her job at risk.

77.     Robyn Newell is a police officer with the Department.

78.     She has worked for Provo City for 9 years. She currently works in community-oriented policing. Ms. Newell has been nothing but an exemplary officer and public servant during her time with the Department.

12

79.     Chief King sexually assaulted Ms. Newell on four or five separate occasions. Specifically, Chief King would approach Ms. Newell and "hug" her from the side. However, in doing so, Chief King would press his fingers underneath Ms. Newell's police vest so that he could grope her breast.

80.     Similar to his behavior toward Ms. Craig, Chief King would then, as he was groping Ms. Newell's breast, pull her toward his body firmly pressing her other breast against his body.

81.     Ms. Newell would do everything she could to avoid Chief King and, when forced to be in the same room as him, would stay as far away from him as possible.

82.     Ms. Newell also recalls that Chief King would openly leer and stare at her breasts whenever she was in street clothes.

83.     His behavior would make Ms. Newell extremely uncomfortable; yet, she had no one with whom she could report Chief King's behavior and feared retribution.

84.     To this day, Ms. Newell remains fearful of retribution from the current administration as Chief King's behavior was allowed to occur without any redress.

85.     Another employee, who is not a plaintiff ("Employee 1"), started working part-time for the Provo City Police Department in 2002.  Employee 1 says that, before Chief King arrived in Provo, the other police chiefs rarely came to the dispatch center.

86.     Chief King, by contrast, made frequent visits to the center, often in the early morning hours.  During these visits, Employee 1 recalls, Chief King would hover over each of the dispatchers, all of whom were female, touching their shoulders and attempting to look down their shirts.

87.     It got to the point where, upon the arrival of Chief King at the dispatch center, the dispatchers would immediately "stand up" or "cover up" to try to avoid Chief King's leering.

88.     Employee 1 became so uncomfortable regarding the situation that she voiced her concerns about Chief King's behavior to Sergeant Powell, Senior Officer Barson, and dispatch supervisor Heather Perkins.

89.     These individuals acknowledged that Chief King's conduct was improper, but minimized Employee 1's concerns by encouraging her to "ride it out" and suggesting that perhaps that was "how they behave on the east coast."

90.     Another employee, also not a plaintiff ("Employee 2"), worked at the Provo City Policy Department from March 2013 to November 2017.

91.     She corroborated the experiences of the other employees and dispatchers, noting that Chief King would stop by the dispatch center "at weird, random hours," with no apparent purpose other than to harass the female dispatchers.

92.     Chief King was not usually in uniform during these visits, instead wearing shorts and a t-shirt.

93.     According to Employee 2, Chief King's visits typically lasted about half an hour, during which he would move from station to station, ostensibly looking at each dispatcher's computer screen but in reality trying to look down each dispatcher's shirt.

94.     To avoid Chief King's leering, the dispatchers would put on a sweater, adjust their clothing, or stand up and walk around upon Chief King's arrival.

95.     Employee 2 strongly believed that Chief King's actions toward her and the other dispatchers constituted sexual harassment in the workplace, but when she saw that nothing was

14

done in response to Ms. Collett's formal complaint, she didn't see why she should risk her job just to file a complaint that no one would do anything about.

96.     Chief King also tried to develop off-duty relationships with women working as victim's advocates. He would attend training associated with victim's advocates because those attendees were women.

97.     Several employees spoke with supervisors or other management personnel about Chief King's behavior, but his conduct did not change, and he was never disciplined.

98.     Indeed, in the fall of 2014, after Ms. Collett's complaint and departure, Mayor John Curtis called a mandatory meeting for all supervisors.

99.     During this 2014 meeting, with Chief King standing at his side, the Mayor told all the supervisors that he did not want to hear any more complaints about Chief King.  Mayor Curtis also told the supervisors that Chief King would remain chief for as long as Curtis was mayor.

100.     Additionally, and upon information and belief, there was at least one closed-door meeting held in late 2015 or early 2016 by the Provo City Council regarding Chief King and his continued misconduct, including sexual misconduct.

101.     Upon information and belief, none of these meetings resulted in the discipline or censure of Chief King.

102.     Chief King used his position of police authority to isolate, assault, and harass Ms. Collett, Ms. Craig, Ms. Adams, and Ms. Newell ("employee-Plaintiffs") by ordering meetings and placing himself in positions during work to harass or assault them.

103.     Unfortunately, despite the numerous warning signs surrounding Chief King's behavior, his power remained unchecked and he was held accountable to no one.

104.     The result of this unfettered power was the rape of Brieanne Van De Graaff.

105.     In 2016, Ms. Van De Graaff began attending meetings of the Department's Citizen Advisory Board (CAB), which Chief King created and managed.

106.     At the time, Ms. Van De Graaff was 24 years old and was a student at Utah Valley University

107.     Ms. Van De Graaff was interested in further research in her major and Chief King agreed to assist her on research projects. A short time after Ms. Van De Graaff became involved with the CAB, Chief King started acting in a sexually aggressive manner toward her.

108.     During the few months of contact between Chief King and Ms. Van De Graaff, Chief King's sexually aggressive comments and unwanted touching increased.

109.     In the end of October, 2016, Ms. Van De Graaff attempted to set clear professional boundaries, and made it clear to Chief King that she did not want to have a romantic or sexual relationship with him, but still wanted to continue the research projects with the Provo City Police and work with the CAB.

110.     Chief King disregarded Ms. Van De Graff's boundaries and physically touched, kissed, and groped Ms. Van De Graaff without her consent on numerous occasions.

111.     In January, 2017, Chief King engaged in nonconsensual sexual contact with Ms. Van De Graaff and, despite her protests to Chief King that she did not want to engage in sexual relations, Chief King persisted and raped Ms. Van De Graaff, invading her bodily integrity.

112.     During her interactions with Chief King, Ms. Van De Graaff felt she was unable to report Chief King's misconduct due to his position of authority as Chief and her fear of him.

4825-5392-6495v1

113.   In January, 2017, Chief King left on vacation and Ms. Van De Graaff felt she had a window of safety to report him.

114.   Ms. Van De Graaff, not knowing to whom to report sexual assault by a Chief of Police, called then-Mayor John Curtis and reported her assault directly to him over the telephone.

115.   Mayor Curtis placed Chief King on administrative leave.

116.   Even then, however, Mayor Curtis tried to sweep Chief King's misconduct under the rug, telling the Department that Chief King had taken administrative leave to care for his sick mother.

117.   After deciding to demand Chief King's resignation, Mayor Curtis still kept up the ruse, telling everyone that the only reason for Chief King's departure was his need to be with his sick mother.

118.   Worse still, Mayor Curtis planned a going-away party for Chief King despite knowing about the allegations against him.

119.   Even though the media broke the story about Chief King's sexual assault of Ms. Van De Graaff approximately twenty minutes before the party was scheduled to start, upon information and belief, the party still went forward as planned.

120.   In making the decision to hire Chief King, Provo reportedly relied on Citygate Associates, LLC, to track down and recruit potential candidates.

121.   Provo did not explain, and to date has not explained, why it delegated its statutory responsibility to verify the background of policymakers to Citygate; why it did not independently confirm Citygate's findings or the "great reviews" on which Curtis relied; why it did not contact the Baltimore or Gaithersburg police departments to verify King's work history or the reasons for

17

his dismissal; why it did not simply conduct an internet search on King, which would have turned

up news articles discussing King's departure under suspicious circumstances involving "personnel

issues" from at least two police departments, as well as a prior investigation by the Department of

Justice for unrelated misconduct; or why, if it did conduct a thorough investigation of King's

background, Provo chose to hire King despite his past wrongdoing.

122.    Provo has also never explained why it retained Chief King in a policymaking

position, without even taking disciplinary action, following at least one formal complaint against

him alleging sexual misconduct, as well as numerous informal complaints and discussions between

employees and superiors regarding Chief King's inappropriate behavior.

123.    Chief King's conduct displayed a pattern of abuse in which Chief King used his

position of authority within Provo to harass and assault the employee-Plaintiffs and to force or

coerce Ms. Van De Graaff to engage in sexual behavior.

124.    Chief King would not have been able to engage in his outrageous conduct had he

not been acting under color of state law.

## FIRST CAUSE OF ACTION

### Equal Protection Claim Under 42 U.S.C. § 1983 – John King

### (All Plaintiffs)

125.    Plaintiffs incorporate and reallege the allegations of each of the preceding

paragraphs as if fully set forth herein.

126.    Acting under color of state law, Chief King sexually harassed Plaintiffs Cory

Collett, Paula Craig, Kjirsten Adams, and Robyn Newell.

18

127.     He leered at their breasts, touched them sexually against their will and without their consent, and verbally harassed them.

128.     Chief King committed these acts based on the fact that these Plaintiffs are women. In other words, Chief King mistreated these Plaintiffs based on their sex.

129.     In so doing, Chief King violated these women's rights to equal protection, in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

130.     In particular, and as set forth above, Chief King discriminated against Ms. Collett, Ms. Craig, Ms. Adams, and Ms. Newell, specifically, individually, and generally, on the basis of their sex, depriving each of her rights to the equal protection of the laws.

131.     Acting under color of state law, and as set forth above, Chief King sexually harassed and assaulted Ms. Van De Graaff.

132.     He touched her sexually against her will and raped her on four separate occasions.

133.     Chief King committed these acts against Ms. Van de Graff based on her sex.

134.     In so doing, Chief King violated Ms. Van De Graaff's right to equal protection under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

135.     All five Plaintiffs have suffered harm as a result of Chief King's mistreatment of them on the basis of their sex.

136.     The harm these Plaintiffs have suffered includes, among other things, psychological and emotional distress, lost wages, and medical expenses.

4825-5392-6495v1

## SECOND CAUSE OF ACTION

**Substantive Due Process Claim Under 42 U.S.C. § 1983 – John King**

**(Ms. Van De Graaff)**

137.    Chief King's sexual assaults and rapes of Ms. Van De Graaff violated her fundamental right to bodily integrity and deprived her of her right to substantive due process under the Due Process Clause of the Fourteenth Amendment.

138.    King's sexual misconduct demonstrated a degree of outrageousness and a magnitude of harm so great as to shock the conscience.

139.    Chief King acted under color of state law when committing his assaults on Ms. Van De Graaff.

140.    Ms. Van de Graff has suffered physical and emotional harm as a result of Chief's King's outrageous conduct, including, but not limited to, medical expenses, mental anguish, and emotional distress.

## THIRD CAUSE OF ACTION

***Monell* Liability for the Sexual Harassment and Sexual Assaults of Plaintiffs under 42 U.S.C. § 1983 – City of Provo, Utah**

**(All Plaintiffs)**

141.    Plaintiffs incorporate and reallege the allegations of each of the preceding paragraphs as if fully set forth herein.

*Chief King as Provo City Policymaker*

142.    Provo City is liable under 42 U.S.C. § 1983 for the harm perpetrated upon Ms. Collett, Ms. Craig, Ms. Adams, Ms. Newell, and Ms. Van De Graaff.

4825-5392-6495v1

143.    Chief King acted as a final policymaker of Provo City during his tenure as Provo City Chief of Police.

144.    Under Provo Code § 9.01.030, the Chief of Police has authority to "make and adopt rules and regulations for the operation of the [D]epartment," subject only to optional review by the Mayor.

145.    Chief King thus had the authority to, and did, create and promulgate, either formally or informally, Department policy regarding sexual harassment and responses to such harassment, as well as to define standards of conduct governing interactions between Department employees and outside volunteers, CAB members, and citizens.

146.    Evidencing Chief King's final policy-making authority in these matters is the fact that Chief King was never meaningfully questioned about or disciplined for his conduct within the Department.

147.    Thus, Chief King was the final arbiter of complaints regarding sexual harassment, sexual assault, and workplace misconduct within the Department. As such, he acted as a Provo City policymaker.

148.    Because Chief King's intentional misconduct against Plaintiffs arose out of his position as a Provo City policymaker, Provo City is liable for that misconduct.

*Provo City's Deliberate Indifference*

149.    Provo City was deliberately indifferent to the harm that might be perpetrated upon Ms. Collett, Ms. Craig, Ms. Adams, Ms. Newell, and Ms. Van De Graaff.

150.     In particular, despite its awareness of Chief King's sexual misconduct, Provo City failed to train, supervise, correct, or otherwise discipline Chief King in the area of sexual harassment, sexual assault, and workplace misconduct.

151.     Provo also failed to provide adequate training regarding sexual harassment or appropriate procedures governing the behavior of the Provo City Chief of Police toward outside volunteers or citizens.

152.     First, Provo failed to perform a background check sufficient to identify widely reported instances in which King had been forced out of his position for suspicious "personnel reasons," or else failed to sufficiently investigate the facts behind those departures, despite public representations that the search for a new Chief of Police took "months" and was deliberately slowed down to determine the best candidate.

153.     In the alternative, Provo did have knowledge of King's prior misconduct, and hired him anyway, giving him a policy-making position with a great deal of power over subordinates, volunteers, and the general public, and ignoring that the plainly obvious consequence of the hiring would be a deprivation of the rights of employees and citizens.

154.     After King was hired, Provo failed to develop and promulgate training and standards of behavior sufficient to prevent King from sexually harassing his subordinates, or to discipline him for doing so, or to otherwise correct his behavior.

155.     Provo City officials, including Mayor Curtis, learned of Chief King's sexual harassment of Ms. Collett early in King's tenure, but declined to take *any* steps to address that behavior. To the contrary, Mayor Curtis called a department meeting to discourage further complaints.

156.    In 2015 or 2016, Provo City officials, including Mayor Curtis and members of the Provo City Council, were again informed of Chief King's sexual harassment of Department employees. Again, nothing was done to discipline or otherwise correct Chief King's behavior.

157.    Despite the clear risk, Provo failed to implement safeguards that would have prevented or stopped Chief King's misconduct within the workplace, his assaults on various employees, or his subsequent assaults on Ms. Van De Graaff.

158.    Such overt disregard for the risk that King posed, given his prior conduct and his expected position as Chief, also represents deliberate indifference.

159.    These failures led directly to and caused the continued sexual harassment and assault of employees of the Provo City Police Department.

160.    Provo likewise failed to train officers and supervisors regarding when, where, how, and for what purpose it is or is not appropriate for members of law enforcement to interact with Department volunteers or CAB members.

161.    Plaintiffs suffered damages at the hands of Chief King as a result of Provo City's deliberate indifference to Chief King's ongoing misconduct. Provo is therefore liable for those damages.

## FOURTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress – John King

### (All Plaintiffs)

162.    Plaintiffs incorporate and reallege the allegations of each of the preceding paragraphs as if fully set forth herein.

163.    Chief King's repeated sexual harassment and sexual assaults of the employee-Plaintiffs, along with his abuse of authority as Chief of Police to effectuate such sexual harassment and assault, constitute outrageous and intolerable conduct.

164.    Chief King either intended to inflict severe emotional distress upon each of the employee-Plaintiffs or knew or should have known that sexual harassment and assault would cause each of the employee-Plaintiffs to suffer such distress.

165.    As a result of Chief King's actions, each employee-Plaintiff suffered physical harm, discomfort, and distress as well as mental anguish and distress.

166.    Chief King's repeated rapes and sexual assaults of Ms. Van De Graaff, along with his abuse of his authority as Chief of Police to effectuate those assaults, constitute outrageous and intolerable conduct.

167.    King either intended to inflict severe emotional distress upon Ms. Van De Graaff, or knew or should have known that rape and sexual assault would cause Ms. Van De Graaff to suffer such distress.

168.    As a direct result of Chief King's actions, Ms. Van De Graaff felt extreme fear, horror, and shame throughout the months of abuse, and continues to suffer severe mental distress to the present day.

169.    Chief King's actions constitute willful misconduct as defined by Utah Code Ann. § 63G-7-102(11), and therefore King retains no immunity from suit, pursuant to Utah Code Ann. § 63G-7-202(3)(c)(i).

4825-5392-6495v1

## FIFTH CAUSE OF ACTION

### Assault – John King

### (Ms. Craig, Ms. Adams, Ms. Newell, and Ms. Van De Graaff)

170.    Plaintiffs incorporate and reallege the allegations of each of the preceding paragraphs as if fully set forth herein.

171.    Chief King's behavior at the outset of each instance of sexual assault against the individual employee-Plaintiffs was intended to cause apprehension of imminent harmful or offensive contact against Ms. Craig, Ms. Adams, and Ms. Newell respectively.

172.    As a result of these actions, Ms. Craig, Ms. Adams, and Ms. Newell were respectively placed in imminent apprehension of such contact.

173.    Chief King's behavior at the outset of each instance of sexual assault or rape was intended to cause Ms. Van De Graaff apprehension of imminent harmful or offensive contact.

174.    As a result of these actions, Ms. Van De Graaff was placed in imminent apprehension of such contact.

175.    King's actions constitute willful misconduct as defined by Utah Code Ann. § 63G-7-102(11), and therefore King retains no immunity from suit, pursuant to Utah Code Ann. § 63G-7-202(3)(c)(i).

## SIXTH CAUSE OF ACTION

### Battery – John King

### (Ms. Craig, Ms. Adams, Ms. Newell, and Ms. Van De Graaff)

176.    Plaintiffs incorporate and reallege the allegations of each of the preceding paragraphs as if fully set forth herein.

177.    Chief King acted intentionally in each incident of sexual assault or rape.

25

178.    King repeatedly made physical contact with Ms. Craig, Ms. Adams, and Ms. Newell's person and effects, each without their individual consent.

179.    As a result of these contact, Ms. Craig, Ms. Adams, and Ms. Newell suffered physical, mental, and emotional harm.

180.    King repeatedly made physical contact with Ms. Van De Graaff's person and effects without her consent.

181.    As a result of this contact, Ms. Van De Graaff suffered physical, mental, and emotional harm.

182.    King's actions constitute willful misconduct as defined by Utah Code Ann. § 63G-7-102(11), and therefore King retains no immunity from suit, pursuant to Utah Code Ann. § 63G-7-202(3)(c)(i).

## SEVENTH CAUSE OF ACTION

### False Imprisonment – John King

### (Ms. Van De Graaff)

183.    Plaintiffs incorporate and reallege the allegations of each of the preceding paragraphs as if fully set forth herein.

184.    King acted with the intent to detain Ms. Van De Graaff by physically restraining her, as well as by confining her in various rooms of both his and Ms. Van De Graaff's home, and in his car under false pretenses.

185.    Ms. Van De Graaff did not consent to any instance of physical restraint or confinement.

186.    King's detentions of Ms. Van De Graaff were unlawful.

26

187.    As a result of this unlawful confinement, Ms. Van De Graaff suffered physical, mental, and emotional harm.

188.    King's actions constitute willful misconduct as defined by Utah Code Ann. § 63G-7-102(11), and therefore King retains no immunity from suit, pursuant to Utah Code Ann. § 63G-7-202(3)(c)(i).

## EIGHTH CAUSE OF ACTION

### Negligent Employment/Supervision/Retention – Provo City

### (All Plaintiffs)

189.    Plaintiffs incorporate and reallege the allegations of each of the preceding paragraphs as if fully set forth herein.

190.    Provo has a duty to protect its citizens from foreseeable harm at the hands of its employees and law enforcement officers.

191.    Provo breached that duty by, among other things, failing to properly investigate Chief King's background before his hiring; by hiring King despite easily discovered information that would have warned Provo of King's proclivity for sexual misconduct; by failing to adequately supervise King's conduct toward employees, volunteers, and citizens; and/or by retaining Chief King in a policy-making position after receiving complaints of Chief King's sexual and other misconduct.

192.    As a direct and foreseeable consequence of Provo's negligence in hiring, failing to supervise, and retaining King, Ms. Collett, Ms. Craig, Ms. Adams, Ms. Newell, and Ms. Van De Graaff suffered the injuries described above.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs prays for judgment against Defendants as follows:

1.      For judgment in Plaintiffs' favor and against both Defendants for violation of employee-Plaintiffs' Equal Protection rights.

2.      For judgment in Plaintiffs' favor and against both Defendants for violation of employee-Plaintiffs' Due Process rights;

3.      For judgment in Plaintiffs' favor and against Defendant John King for intentional infliction of emotional distress;

4.      For judgment in Plaintiffs' favor and against Defendant John King for assault, and battery;

5.      For judgment in Brieanne Van De Graaff's favor and against John King for false imprisonment;

6.      For judgment in Plaintiffs' favor and against Defendant City of Provo, Utah, for negligent employment;

7.      For an award of compensatory and punitive damages in favor of Plaintiffs and against Defendant City of Provo, Utah, including damages resulting from emotional distress, in excess of an amount of $300,000, to be determined at trial;

8.      For an award of compensatory and punitive damages against Defendant John King, including damages resulting from emotional distress, in an amount in excess of $300,000 to be determined at trial;

9.      For an award of reasonable attorneys' fees and costs associated with this action;

10.     For an award of post-judgment interest as allowed by law;

4825-5392-6495v1

11.     For an award of non-monetary damages in favor of Plaintiffs and against the City of Provo as follows:

    a.  The institution of approved Annual Harassment, Discrimination, and Retaliation Training for all Provo City Police Department supervisors, officers, and employees (including additional approved training for Human Resource employees);

    b.  The institution of approved Annual Harassment, Discrimination, and Retaliation Training for all members of the Provo City Mayor's Office;

    c.  The institution of approved mandatory guidelines for the confidential investigation and resolution of any complaint or claim of harassment or discrimination lodged against the Provo City Police, with such guidelines to include an independent, extra-Departmental process for reporting, investigation, and resolution of any such complaints or claims;

    d.  The institution of approved guidelines for the full and complete vetting of the hiring and/or promotion of individuals as Chief of Police, supervisor, and/or other managerial or supervisory position; and

    e.  The institution of a third-party hotline and independent service wherein persons who have suffered from sexual assault or harassment may report and have their reports processed.

12.     For such other and further relief as the Court may deem just.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all causes of action.

DATED this 20th day of March, 2018.

*/s/ Michael W. Young*
Katherine Venti
Michael W. Young
Alan S. Mouritsen
PARSONS BEHLE & LATIMER

Attorneys for Plaintiffs

4825-5392-6495v1